UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MICHAEL L. FARLEY and
KIMBERLY FARLEY,

                          Plaintiffs,

v.                                        **DECISION AND ORDER**
                                                  11-CV-198S

UNITED STATES OF AMERICA,

                          Defendant.

## I.    INTRODUCTION

Michael Farley brings this negligence action against Defendant the United States of America under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b). Presently before this Court is Defendant's third motion to dismiss (or, in the alternative, for summary judgment), in which it argues that certain exceptions to the FTCA apply here and serve to prohibit Farley from bringing this suit. For the following reasons, Defendant's motion is granted.

## II.    BACKGROUND

### A.    Factual History[1]

At the time of the relevant events, Farley was employed as a security officer with Asset Protection & Security ("Asset"). Asset is a private company that contracted with the Department of Homeland Security, Immigration and Customs Enforcement ("ICE") to "furnish unarmed custody officer services, including management personnel, supervision, manpower, relief custody officers, uniforms, equipment, and supplies to provide custody

---

[1] For the sake of brevity and clarity, this Court will recite only those facts pertinent to the pending motion. The facts are drawn from the parties' Rule 56 Statements of Facts and the attached exhibits, and are undisputed unless otherwise noted.

1

officer services seven (7) days a week, twenty-four (24) hours per day at" the Buffalo Federal Detention Facility located in Batavia, New York (the "Detention Facility").[2] As part of Farley's duties, he worked at different Asset-controlled posts within the Detention Facility, including housing units. Pursuant to Asset's contract with ICE, Asset was responsible for "security, care, and supervision of detainees," as well as "for the safety and security of the facility." However, ICE maintained decision-making authority as to where detainees were housed, whether they were classified as security risks, and how and when certain detainee information would be disseminated. ICE also maintained a staff presence on site to inspect the facility and ensure that Asset personnel were complying with the terms of the contract. These ICE inspections included at least one round per shift (there were three eight-hour shifts per day) through the Detention Facility, stopping at each housing unit. During rounds, ICE supervisors would check and sign log books, speak with Asset officers, and sometimes speak with detainees. If compliance issues were noted, an ICE supervisor would report them to an Asset supervisor.

On August 11, 2008, Detainee T (whose full name has been purposely withheld) arrived at the Detention Facility. Detainee T was classified as "Level 3," the highest security classification, due to a domestic assault conviction and a history of mental health issues. Level 3 detainees wear red uniforms (in contrast to detainees who are deemed lower risk, and wear either blue or orange uniforms), and are assigned to a housing unit where they are placed in locked cells and segregated from lower risk detainees. On August 19, 2008, Detainee T threatened to fight any officer who tried to place handcuffs

---

[2] The Detention Facility was originally under the control of Immigration and Naturalization Services ("INS"), but this changed on March 1, 2003 when INS was dissolved and its responsibilities transferred to the Department of Homeland Security. Homeland Security Act, Pub. L. 107-296, § 291, 116 Stat. 2135 (2002).

2

on him during processing. This threat was documented by an Asset officer and, while it is not clear how that report was escalated, it was eventually placed in Detainee T's detention file, and therefore came into the possession and control of ICE. It appears that the report was not relayed to other Asset employees.

Detainee T was punished for his failure to follow facility guidelines by being placed in the Segregated Housing Unit ("SHU"). On August 20, 2008, Detainee T was written up and given fourteen days in SHU because of his refusal to be handcuffed and refusal to return to his housing unit. Because Detainee T continued refusing handcuffs at the end of the fourteen days, his SHU detention was renewed on September 4, 2008. The records relating to Detainee T's disciplinary violations document this noncompliance, but do not indicate any violence or threats of violence.

The Asset officers who supervised Detainee T while he was in SHU also testified that Detainee T had not made any threats or been violent, though they did state that he was verbally combative and non-compliant with rules and orders. No Asset officer made a log entry or any other documentation of Detainee T's behavior while in SHU. Asset Officer David Thom stated that he did not think it necessary to document Detainee T's behavior because it was already known by others and, if he wrote down every incident, it would fill the log book. While Detainee T was in SHU, he was assessed for potential mental health problems by ICE medical staff. The staff found him to be somewhat delusional with evidence of paranoia, as well as a history of hearing voices, and prescribed Risperdal with the caveat that there was no need to force the medication if Detainee T refused to take it. The documentation of this evaluation was sent to ICE processing and was not relayed to Asset officers.

On September 23, 2008, Detainee T was no longer refusing handcuffs and ICE determined that there was no longer any basis to hold him in SHU. He was handcuffed without incident and taken to be processed for release back to the "Bravo 1" locked-cell housing unit. After "processing," which generally takes 30-45 minutes and during which a detainee's cuffs are removed, Detainee T arrived at Bravo 1. He was free to leave his cell for approximately two-and-a-half hours during that day for recreation and dinner, and records indicate that this time also passed without incident.

Farley began his shift on the Bravo 1 housing unit at 3:55 p.m. At approximately 9:00 p.m., the cells were again unlocked for an indoor recreation period. Detainee T left his cell and, at approximately 9:04 p.m., began to assault Farley. Farley alleges that Detainee T approached him from behind, exclaimed, "where's my [expletive] money, give me my [expletive] money." Farley also alleges that Detainee T exclaimed, "I told you that I was going to hurt the first officer that I got my hands on and I did" and, "I told them I was going to do it and I did it." Though Farley's recollection of the event is not completely clear, he does remember being repeatedly struck on the head, struggling with Detainee T, and trying to use his radio to call for help. Shortly thereafter, at approximately 9:05 p.m., two officers arrived, stopped the assault, and handcuffed Detainee T. Farley was then taken to the hospital by a co-worker. He alleges that he suffered a broken nose, neck injury, and permanent traumatic brain injury as a result of the assault.

There is no documentation of Detainee T's alleged threats to "hurt the first officer" he saw, nor is there any testimony from the officers who observed Detainee T in SHU that he previously made such a threat.

**B.     Procedural History**

Defendant has made two previous motions challenging the sufficiency of Plaintiffs' pleadings, and familiarity with this Court's prior orders is assumed.[3] Plaintiffs commenced this action on March 8, 2011 by filing a complaint in this Court. Defendant filed its first motion to dismiss on June 20, 2011. On March 4, 2012, this Court granted that motion in part, dismissing the loss of consortium claim brought by Farley's wife, any claims that sought to hold Defendant liable for alleged negligence in the selection and supervision of Asset employees, and any claims that Defendant "fail[ed] to exercise its authority to inspect Asset's compliance with the terms of the contract." Farley I, 2012 WL 713399, at *7. However, it denied the motion as to certain aspects of Farley's FTCA claims, noting that "the record [was] insufficiently developed" to issue a final ruling with respect to all of Defendant's jurisdictional arguments for dismissal. Id.

The parties then conducted limited discovery on the issue of jurisdiction, after which, on May 22, 2013, Defendant filed a second motion to dismiss, or in the alternative, for summary judgment. On January 15, 2014, this Court again denied the motion, finding that two potentially viable theories for Plaintiff's negligence claim remained: (1) that ICE officials negligently failed to disclose relevant information to Farley regarding Detainee T's propensity for violence, and (2) that ICE officials negligently released Detainee T from SHU. Farley II, 2014 WL 198331, at *6. This Court further noted that, although the discretionary-function exception may be applicable in this case, Defendant had failed to meet its burden demonstrating that application was appropriate because it had not set

---

[3] Farley v. United States, No. 11-CV-198S, 2012 WL 713399 (W.D.N.Y. Mar. 5, 2012) ("Farley I"); Farley v. United States, No. 11-CV-198S, 2014 WL 198331 (W.D.N.Y. Jan. 15, 2014) ("Farley II").

forth a basis for why the alleged negligent acts could be considered discretionary functions.

The parties have now completed discovery, and the Defendant has filed the motion presently before this Court, the renewed Motion to Dismiss the Complaint and in the Alternative for Summary Judgment.

### III. DISCUSSION

Farley alleges that Defendant, specifically ICE, was negligent in operating the Detention Facility and that this negligence led to his injuries. Plaintiffs bring these claims against Defendant under the authority of the FTCA. Defendant argues that this Court does not have subject matter jurisdiction over the claims or, in the alternative, that it is entitled to summary judgment.

A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). The plaintiff bears the burden of establishing the existence of federal jurisdiction. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). The jurisdictional challenge here is based on sovereign immunity, which shields the United States from suit without its consent and strips this Court of jurisdiction. See, e.g., F.D.I.C. v. Meyer, 510 U.S. 471, 475, 114 S. Ct. 996, 1000, 127 L. Ed. 2d 308 (1994). In resolving such a challenge, the court may consider affidavits and other evidence outside the pleadings. See J.S. v. Attica Cent. Schs., 386 F.3d 107, 110 (2d Cir. 2004), cert. denied, 544 U.S. 968, 125 S. Ct. 1727, 161 L. Ed. 2d 616 (2005). Indeed, courts "must" consult factual submissions "if resolution of a proffered factual issue may result in the dismissal of the

complaint for want of jurisdiction." Robinson v. Gov't of Malaysia, 269 F.3d 133, 140 n. 6 (2d Cir. 2001).

Under Federal Rule of Civil Procedure 56, the court can grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact." A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In determining whether a genuine dispute regarding a material fact exists, the evidence and the inferences drawn from the evidence "must be viewed in the light most favorable to the party opposing the motion." Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct. 1598, 1609, 26 L. Ed. 2d 142 (1970) (internal quotations and citation omitted).

## A. Subject Matter Jurisdiction

"It is elementary that the United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Mitchell, 445 U.S. 535, 538, 100 S. Ct. 1349, 63 L. Ed. 2d 607 (1980) (internal citations, quotation marks, and modifications omitted). The FTCA constitutes such consent by waiving sovereign immunity for:

> [C]ivil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.[4]

---

[4] The law of New York State applies here.

28 U.S.C. § 1346(b)(1). While these provisions of the FTCA constitute a broad waiver of the government's sovereign immunity, Congress has exempted certain classes of tort claims. When evaluating whether a claim is exempt, "the government's waiver of sovereign immunity under the FTCA must be strictly construed in favor of the government." Akutowicz v. United States, 859 F.2d 1122, 1125 (2d Cir. 1988) (internal quotation omitted).

For purposes of the FTCA, employees of the government are "officers or employees of any federal agency." 28 U.S.C. § 2671. In turn, federal agencies include "the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States." Id. Courts have interpreted this provision to expressly preclude the United States from being held liable for the negligence of its independent contractors. Roditis v. United States, 122 F.3d 108, 111 (2d Cir.1997) ("[S]overeign immunity precludes suits against the United States for injuries caused by its independent contractors."). This exception has narrowed the scope of Plaintiffs' claims to those which relate specifically to ICE as opposed to Asset contractors. See Farley II, 2014 WL 198331, at *6.

The discretionary-function exception presents a further limitation on the waiver of sovereign immunity. Pursuant to 28 U.S.C. § 2680(a), the discretionary-function exception bars suits against the United States for:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary

> function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

This exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808, 104 S. Ct. 2755, 2762, 81 L. Ed. 2d 660 (1984). Separation of powers principles further support Congress' decision to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Id. at 814. It is a plaintiff's burden in the first instance to come forward with a complaint that adequately alleges a claim that is not barred by the discretionary-function exception. Coulthurst v. United States, 214 F.3d 106, 111 (2d Cir. 2000). If the United States responds by demonstrating that the action falls within a discretionary framework, a plaintiff must rebut that showing sufficiently to demonstrate that there is a plausible case for non-discretionary or non-policy action in order to defeat dismissal. Id. at 110.

The Supreme Court's decisions in Berkovitz v. United States, 486 U.S. 531, 108 S. Ct. 1954, 100 L. Ed. 2d 531 (1988), and United States v. Gaubert, 499 U.S. 315, 111 S. Ct. 1267, 113 L. Ed. 2d 335 (1991), outline the test for whether the FTCA's discretionary-function exception may apply to particular conduct. Under the Berkovitz-Gaubert test, the United States remains immune from suit "if two conditions are met: (1) the acts alleged to be negligent must be discretionary, in that they involve an 'element of judgment or choice' and are not compelled by statute or regulation and (2) the judgment or choice in question must be grounded in 'considerations of public policy' or susceptible

to policy analysis." Coulthurst, 214 F.3d at 109 (citing Gaubert, 499 U.S. at 322-23; Berkovitz, 486 U.S. at 536-37).

Under the first prong, a court must consider whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment or choice. Gaubert, 499 U.S. at 322-23. "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation or policy specifically prescribes a course of action for an employee to follow,' because 'the employee had no rightful option but to adhere to the directive.'" Id. at 322 (quoting Berkovitz, 486 U.S. at 536). At the second step, determination of whether the judgment in question is "of the kind" to which the discretionary-function exception applies requires a court to examine whether the exercise of that judgment involves policy considerations. The Supreme Court has indicated that "the focus of [this] inquiry is . . . on the nature of the actions taken and on whether they are susceptible to policy analysis." Gaubert, 499 U.S. at 325. Thus, whether a decision is made at the operational versus the planning level is not determinative of whether the act of judgment is the result of policy considerations: the status of the actor in question does not control. Berkovitz, 486 U.S. at 536; see also Brown v. United States, No. 92-CV-82S, 1994 WL 319015, at *8 (W.D.N.Y. June 8, 1994) ("Further, the subjective intent of the actor in question does not control . . . [t]he key inquiry is whether the decisions, be they initial decisions or implementation decisions, are necessarily susceptible to policy analysis." (citing Andrulonis v. United States, 952 F.2d 652, 654-55 (2d Cir. 1991), *cert. denied*, 505 U.S. 1204, 112 S. Ct. 2992, 120 L. Ed. 2d 869 (1992))). Finally, for purposes of determining susceptibility to policy analysis, "it is unimportant whether the government actually balanced economic, social, and political concerns in reaching its decision," it is only

necessary that the decision be "susceptible to policy analysis." In re Joint Eastern & Southern Dist. Asbestos Litig., 891 F.2d 31, 37 (2d Cir. 1989) (citations and quotation omitted omitted).

    1. Dissemination of Information

Plaintiffs contend that ICE was negligent in its failure to disseminate information regarding Detainee T's violent propensities. Plaintiffs have identified the Buffalo Federal Detention Facility Policy 3.1.13, "Facility Intelligence Program," which states:

> It is the policy of the [Detention Facility] to maintain an information based system of identifying, tracking, and informing officers of detainees who present unusual escape or management problems (such as suicide or assault-prone behavior) so officers can properly supervise and manage them on a day-to-day basis.
> ***
> The Facility Intelligence Team will be responsible for informing all staff of new arrivals who pose unusual escape or management problems, as well as any information of this type (including information regarding assault-prone behavior) regarding detainees already housed at the [Detention Facility].

(Docket No. 136, Defendant's Appendix, Exhibit U (the "Policy").) Plaintiffs argue that the August 19, 2008 Report, in which an Asset Officer recorded a threat against custodial officers by Detainee T (that he would fight any officer who tried to place handcuffs on him in processing), demonstrates that Detainee T had presented "assault-prone behavior" and, therefore, that ICE was obligated by the Policy to inform all staff of the threat.

However, the Policy leaves considerable discretion in determining which detainees present "unusual escape or management problems." It does not define "assault-prone behavior," leaving it for the Facility Intelligence Team to determine whether information should be passed on to staff and contractors. Although Plaintiffs contend that a threat such as the one contained in the August 19, 2008 Report is sure evidence of "assault-

11

prone behavior," the threat contained in the report is conditional, and was addressed by the time that Detainee T spent in SHU.

"[I]f a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." Gaubert, 499 U.S. at 324. While this presumption may be rebutted upon a showing that "the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime," id. at 324-35, that is not the case here. The Policy is specifically aimed at increasing safety in the Detention Facility, and discretion is given to those interpreting it to determine how best to achieve that aim. This is precisely the type of policy determination that the discretionary-function is intended to protect: the balance of "considerations of inmate safety, officer safety, and available resources." Young v. United States, No. 12-CV-2342 ARR SG, 2014 WL 1153911, at *14 (E.D.N.Y. Mar. 20, 2014). The policy analysis applies as well with respect to Plaintiffs' contention that Detainee T's medical history and mental illness evaluation should have been shared with staff under the Policy. There is no statute or regulation that addresses the dissemination of medical information, and the release of such information necessarily involves the balancing of a detainee's privacy interests against the need for detainee and officer security.

Accordingly, the decision as to whether or not to disseminate information regarding Detainee T was susceptible to a policy determination that involved balancing safety and security against detainee privacy.

2. Detainee T's Release from SHU

Plaintiffs also contend that ICE was negligent in its release of Detainee T from SHU on September 23, 2008. Although Plaintiffs contend that the release constitutes a violation of accepted correctional practices and procedures, they have not identified any statutes or mandatory regulations that address where a detainee should be housed, nor identified a duty imposed on ICE regarding evaluating a detainee for release from SHU. "In the absence of allegations demonstrating relevant mandatory obligations, the Court presumes that the challenged acts and omissions are discretionary and not amenable to suit." Molchatsky v. United States, 778 F. Supp. 2d 421, 435 (S.D.N.Y. 2011), aff'd, 713 F.3d 159 (2d Cir. 2013), and aff'd, 713 F.3d 159 (2d Cir. 2013).

Defendant contends that the decision requires considerations of policy regarding prison security, and that ICE must balance rights of detainees, possible medical needs, and economic constraints. "The internal security of prisons normally is left to the discretion of prison administrators." Hooker v. United States, No. 11 CIV. 2840 LGS, 2013 WL 3491089, at *5-6 (S.D.N.Y. July 12, 2013) (citing Rhodes v. Chapman, 452 U.S. 337, 349 n. 14, 101 S. Ct. 2392, 2401, 69 L. Ed. 2d 59 (1981)). Decisions regarding the housing of prisoners or detainees, as well as their handling and placement, necessarily implicate safety and security and are therefore the sort of decisions that generally fall under the discretionary-function exception. See Farley I, 2012 WL 713399, at *6 ("FTCA cases have uniformly held that prison decisions regarding security matters are protected by the discretionary function exception." (quoting Chen v. United States, No. 09-CV-2306 (ARR), 2011 WL 2039433, at *8 (E.D.N.Y. May 24, 2011), aff'd 494 F. App'x 108 (2d Cir. 2012))). Accordingly, the decision as to release Detainee T from SHU was susceptible

to a policy determination that involved balancing safety and security against detainee rights and available resources.

   3. Negligent Guard Theory

Plaintiffs argue that, even if the decisions at issue were discretionary and susceptible to policy analyses, the discretionary-function exception is inapplicable under the "negligent guard" theory. In Coulthurst, the Second Circuit distinguished between two types of negligence: negligence arising from a lack of proper care while implementing or designing official policy, and negligence stemming from individual "carelessness," "laziness," and "inattent[ion]." 214 F.3d at 109. The latter class of "negligent acts neither involve an element of judgment or choice within the meaning of Gaubert nor are grounded in considerations of governmental policy," and are therefore not protected by the discretionary-function exception to the FTCA. Id. A plaintiff is thus eligible for recovery when an official, because of laziness, hastiness, or general carelessness, fails to perform his discretionary duty. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 476 (2d Cir. 2006); Chen, 2011 WL 2039433.

Plaintiffs rely on Triestman, 470 F.3d 471, and Hartman v. Holder, No. 100-CV-6107-ENV-JMA, 2009 WL 792185 (E.D.N.Y. Mar. 23, 2009), both cases in which an inmate sued the United States following an attack by another inmate, in support of their argument that the negligent guard theory applies here. In Triestman, the Second Circuit found the *pro se* plaintiff could defeat a pre-discovery motion to dismiss where he alleged that he was attacked because guards had failed to follow internal policies requiring guard-supervision and signaling devices for inmates in locked housing units. 470 F.3d 471. Although defendant argued that it had acted within its discretion, the court found that the

complaint raised a possible argument that the prison's "staffing policy [fell] outside the range of appropriate judgment, such that it [could] no longer be viewed as an exercise of 'discretion' under the discretionary function exception." Id. at 477. Similarly, in Hartman, an inmate attacked plaintiff after an officer had placed the unit on "lock down" for the night and all the inmates were together in the dormitory room. 2009 WL 792185, at *1. Despite rules requiring an officer to conduct frequent rounds when a unit is on lock down, the "uncontroverted" record showed that it took the officer on duty at least fifteen minutes to respond to a "noisy, violent altercation." Id. at *10. The officer had also failed to address plaintiff's multiple reports that he had been receiving threats and his requests to be transferred out of fear for his safety. Id. at *8. The court held that these allegations sufficiently gave rise to an inference of careless disregard of the officer's duties, because the allegations supported the claim that she was "distracted or inattentive." Id. at 10.

Like other negligent guard cases, Triestman and Hartman are "defined by negligent disregard of official policy." Nabe v. United States, No. 10-CV-3232 NGG VPP, 2014 WL 4678249, at *6-7 (E.D.N.Y. Sept. 19, 2014) (citing Coulthurst, 214 F.3d 106 (failure to inspect the safety of weight-room equipment); Hartman v. Holder, No. 00-CV-6107, 2005 WL 2002455 (E.D.N.Y. Aug. 21, 2005); Triestman, 470 F.3d 471). In other words, courts generally apply the negligent guard theory only where "the negligent discretion at issue was the decision to disregard the official policy, not a negligent decision made in pursuit of official policy." Id. But Plaintiffs here have "not pointed to any evidence in the record to affirmatively show that the [ICE employees] acted in a lazy or careless manner, nor do the surrounding circumstances give rise to an inference that the officers must have been negligent." Young, 2014 WL 1153911, at *16-17. Instead, the only

15

evidence presented that suggests ICE could have been warned of the potential attack are Plaintiff's allegations that Detainee T had made previous threats to attack the first officer he saw while in SHU. However, this evidence comes only in the form of rumors—the SHU officers who were deposed have testified that they never heard any threats from Detainee T—and hearsay—Detainee T's alleged statements during the attack as to what he had previously said cannot be considered because they are a recollection of past events.[5] Fed. R. Evid. 803(3). Even taken in the light most favorable to Plaintiffs, the facts underlying this claim place it within the category of discretionary negligence protected by <u>Berkovitz</u> and <u>Gaubert</u>, not the exceptional category of <u>Triestman</u> and <u>Hartman</u>. There is no indication that ICE disregarded any applicable safety policy and so, if the decisions at issue were negligent, they were nevertheless made in furtherance of an issue that is susceptible to policy analysis, not out of laziness or carelessness.

Farley may be correct that, if the ICE employees had made different decisions with regard to Detainee T, the assault may have been prevented. In choosing to release Detainee T from SHU, or in choosing not to disseminate information regarding his conditional threat, ICE employees may have misjudged the situation. But these decisions were not so "far outside the range of appropriate judgment that they can no longer be viewed as an exercise of discretion." <u>Enigwe v. Zenk</u>, No. 03-CV-854 CBA, 2007 WL 2713849, at *9 (E.D.N.Y. Sept. 14, 2007). Rather, faced with a possible but uncertain threat, ICE employees "exercised . . . judgment as to which of a range of permissible

---

[5] Moreover, Plaintiffs' contention that ICE officials were negligent for not recording the threats is misplaced. Although ICE Supervisors made periodic rounds of each unit, including SHU, they were not responsible for recording the day-to-day happenings. That responsibility lay with Asset officers and, if Asset officers were negligent in failing to record Detainee T's behavior, the United States is not liable for their actions under the independent contractor exception.

courses [was] the wisest." Gaubert, 499 U.S. at 325. "Such decisions, even if negligent, are shielded by the discretionary function exception." Chen, 2011 WL 2039433, at *10 (noting that under the FTCA, a court "may not, through hindsight, second-guess the decisions" of federal employees). Therefore the negligent guard theory does not apply.

Accordingly, because the actions taken by ICE employees satisfy both prongs of the discretionary-function exception, and because the negligent guard theory does not apply in this case, this court lacks subject matter jurisdiction over Plaintiffs' claims.

**B.      Summary Judgment**

Having found that this Court lacks subject matter jurisdiction over Plaintiffs' claims, it does not address Defendant's summary judgment arguments.

## IV.     CONCLUSION

Defendant's motion to dismiss for lack of subject matter jurisdiction is granted. This Court lacks jurisdiction to hear Plaintiffs' remaining claims under the discretionary-function exception.

## V.      ORDERS

IT HEREBY IS ORDERED, that Defendant's Renewed Motion to Dismiss (Docket No. 126) is GRANTED;

FURTHER, that the Clerk of Court is directed to close this case.

SO ORDERED.

Dated: August 15, 2017
Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
United States District Judge